**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ROXANNE BRADDY
o/b/o B.T.B. (a minor),**

          **Plaintiff,**

   **v.**                               **Civil Action 2:17-cv-553
Judge Algenon L. Marbley
Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

          **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Roxanne Braddy, acting on behalf of B.T.B., a minor, filed this action seeking review of a decision of the Commissioner of Social Security denying B.T.B.'s application for supplemental security income. For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

## I.    BACKGROUND

Plaintiff is B.T.B.'s maternal grandmother, who filed an application for supplemental security income on his behalf on October 2, 2013, alleging he became disabled on July 1, 2013 due to Attention Deficit Hyperactivity Disorder ("ADHD"), behavioral problems, violent tendencies, and no sexual boundaries. (Tr. 27, PAGEID #: 89). After initial administrative denials of the claim, an Administrative Law Judge ("ALJ") held a hearing on March 11, 2016. (*Id.*). Both Plaintiff and B.T.B. testified. (*Id.*). The ALJ issued a decision denying benefits on April 27, 2016. (Tr. 27–45, PAGEID #: 89–107).

Plaintiff filed the instant case on June 27, 2017, seeking review of the decision denying

B.T.B.'s application for supplemental security income, and it is now ripe for review. (*See* Doc. 3

(complaint); Doc. 11 (administrative record); Doc. 12 (statement of specific errors); Doc. 14

(Commissioner's response); Doc. 15 (Plaintiff's reply)).

## A.      Standard for Child's Application for Benefits

The Sixth Circuit has summarized the regulations concerning a child's application for

disability benefits as follows:

> The legal framework for a childhood disability claim is a three-step inquiry prescribed in 20 C.F.R. § 416.924. The questions are (1) is the claimant working, (2) does the claimant have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings? * * * An impairment can equal the listings medically or functionally * * *. The criteria for functional equivalence to a listing are set out in § 416.926a. That regulation divides function up into six "domains":
>
> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and
> (6) Health and physical well-being.
>
> § 416.926a(b)(1). To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or a marked impairment in more than one. § 416.926a(d). Lengthy definitions for marked and extreme are set out in § 416.926a(e). Each includes instructions on how to use test results:
>
> "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. § 416.926a (e)(2)(i).
>
> "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean. § 416. 926a (e)(3)(i).

2

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009).

**B.      Hearing Testimony**

*1.      Background*

B.T.B. was born on September 18, 2008 (Tr. 30, PAGEID #: 92), and Plaintiff has had custody of him and his two older siblings since he was eighteen months old due to their mother's drug abuse (Tr. 56, PAGEID #: 118; Tr. 82, PAGEID #: 144).  B.T.B. has seen two psychiatrists and has been on four different medications for his mental health.  (Tr. 81, PAGEID #: 143). Plaintiff explained that B.T.B. is undergoing "an investigational type process to find the true correct medication that will help him…." (*Id.*).  B.T.B. was sexually abused when he was three years old.  (Tr. 66, PAGEID #: 128).

B.T.B.'s attorney stated that B.T.B. has received various diagnoses which include ADHD.  (Tr. 83, PAGEID #: 145).  She explained:

> There's a question [with] respect to anxiety disorder or generalized anxiety disorder, in addition to rule out diagnosis of post-traumatic stress disorder, obviously stemming from prior sexual abuse.  There's also consistent diagnosis of oppositional defiant disorder.  In the present case, I believe we have to look at a whole child perspective, considering listings 112.11, 112.04, and 112.06.  The current constellation of symptoms doesn't neatly fit within those limitations, but the medical file as a whole tends to support extreme limitations with respect to interacting and relating to others.  The medical file does support that young [B.T.B.] has experienced significant consequences from the lack of control of his behavior, chief among them being that he's currently seven years old and just now starting kindergarten because his behaviors have gotten to the point that they have prevented him from being maintained in a regular school setting.

(*Id.*).  Thus, B.T.B.'s attorney indicated that his "main limitations to an extreme degree are within the interacting and relating with others."  (*Id.*).

*2.      Plaintiff's Testimony*

Plaintiff explained that B.T.B. can be a "sweet loving little boy" but, "at the same time, there is a demon inside of him."  (Tr. 56–57, PAGEID #: 118–19).  Plaintiff stated that "the

people inside [of B.T.B.'s] head tell him to do things, and he knows he's not supposed to do them, but he do[es] them anyway." (Tr. 57, PAGEID #: 119).

Plaintiff supervises B.T.B. whenever he is around other children because he has touched others in a sexually inappropriate way. (*Id.*; Tr. 66, PAGEID #: 128). Plaintiff explained that:

> [B.T.B.] was molested at three. He and my great-grandson, both the same age, were sexually anally molested by the same perpetrator. Then the two grand—my great-grandson and—[B.T.B.] were caught in the act of oral, still at three—age three. So his early sexual activities ha[ve] been with a male. So I've tried to make sure that I just—just overseeing any time he's playing with my great grandson and sleepovers, I don't allow him to be with other males.

(Tr. 66, PAGEID #: 128). Plaintiff also discovered B.T.B., at age three, in a closet with his hand inside the pull-up of her one-year-old granddaughter. (Tr. 58, PAGEID #: 120; Tr. 66, PAGEID #: 128).

After these incidents, Plaintiff enrolled B.T.B. in a counseling program to help him understand appropriate touching and personal space. (Tr. 66, PAGEID #: 128). Plaintiff's health caused her to cancel and reschedule a number of B.T.B.'s appointments, so B.T.B. was initially discharged from this treatment due to lack of follow-up. (Tr. 80, PAGEID #: 142). B.T.B. subsequently graduated from the program and has been on medication consistently since that time. (*Id.*).

Plaintiff stated that, although B.T.B. "understands personal space … he doesn't always give it." (Tr. 58, PAGEID #: 120). She also testified that "[t]he medication helps to slow him down but it really doesn't help him in his behaviors." (Tr. 66, PAGEID #: 128). Plaintiff explained that B.T.B. also has done other things to hurt children. For example, B.T.B. unscrewed a hot lightbulb using his t-shirt and handed it to Plaintiff's two-year-old grandson, giving him second degree burns on his fingers. (Tr. 57, PAGEID #: 119).

Plaintiff described B.T.B. as destructive, "tear[ing] up" his belongings and his siblings' belongings. (Tr. 67, PAGEID #: 129). Plaintiff stated that B.T.B. "cuts up everything" with scissors, such as "[h]is sheets, his bed, the trim on his bed—on his mattress, on his brother's bed, the plastic off the box spring, his shirt…" (Tr. 73, PAGEID #: 135). Plaintiff also stated that B.T.B. bites things "and he constantly has to have something in [his] mouth chewing," such as a piece of paper, a toy, or a piece of a barrette. (Tr. 67, PAGEID #: 129).

Plaintiff stated that B.T.B. generally is able to dress and bathe himself and knows how to ride a bike. (Tr. 68, PAGEID #: 130; Tr. 70, PAGEID #: 132). B.T.B. sleeps well with the aid of medication. (Tr. 71, PAGEID #: 133). Plaintiff also explained that B.T.B. has difficulty focusing and does not follow instructions. (Tr. 76–77, PAGEID #: 138–39).

Plaintiff has tried a number of preschools for B.T.B., but he "attacked adults," so they called her "to come in to remove him." (Tr. 78, PAGEID #: 140). Additionally, B.T.B. has flipped over tables in school. (*Id*.). Plaintiff also tried to take B.T.B. to a traditional kindergarten but, "an hour later, they demanded [she] come back and get him." (Tr. 74, PAGEID #: 136).

Plaintiff stated that, despite these instances, she "demanded an education for [her] grandson, so they finally found a place, which is a farm with animals and a few children that age from—high school to where he's at." (*Id*.). B.T.B's school is named Briar Patch Ranch, and it is a place where "strik[ing] the teacher" is "expected that because those are the type of children they're working with." (Tr. 78, PAGEID #: 140). In all, B.T.B. was removed from three schools before he arrived at Briar Patch Ranch. (Tr. 79, PAGEID #: 141).

Plaintiff stated that she filed B.T.B.'s application because:

> he does need clothing and—and transportation and, you know, all of that. His destructive behavior makes [Plaintiff] have to buy more than what normally

would be bought for a normal child…. For him to just take a—a brand new pair of shoes, maybe two, three weeks old, and tear the inside out, tear the lining out, you know, take the scissors and—and destruct your—your holes on your pants and those items have to be replaced.

(Tr. 82, PAGEID #: 144). For example, Plaintiff explained that she had recently purchased a bunk bed set, and B.T.B. slept on the top and his brother slept on the bottom. (*Id*.). However, B.T.B. took the slats out and placed them behind the closet door so they couldn't be seen, causing an incident Plaintiff described as follows:

Okay, it's time to go to bed. Lights out. His brother jumps in bed, covers up. [B.T.B.] climbs up the ladder, dives on the bed and the mattress comes down on top of his brother. So in the process of him taking those slats out, because they were a metal, he bent them so they couldn't go back. So a bunk bed set that he— that I paid for, that was only maybe three months old was trashed. So now I had to buy a whole new bedroom set. So these are the type of things that continue to go on and have to be dealt with. And I can't afford it.

(*Id*.). Plaintiff added that "[t]here's no sign that his mother is going to stop her drug use and come and get her children, so [she's] expecting graduation and all of that." (*Id*.).

>        3.        *B.T.B.'s Testimony*

B.T.B. did not remember telling Plaintiff that voices inside his head tell him to do bad things. (Tr. 62, PAGEID #: 124). Instead, B.T.B. said he doesn't know why he does bad things, and there are times when he cannot control himself. (Tr. 63, PAGEID #: 125). B.T.B. testified that counseling has been helpful, but his medication is only minimally helpful. (Tr. 64, PAGEID #: 126).

B.T.B. stated that he has four friends at school and in the neighborhood, including one best friend. (Tr. 59–60, PAGEID #: 121–22). He likes to watch television and play with toys. (Tr. 60, PAGEID #: 122). B.T.B. admitted to throwing chairs and tipping tables at school when he gets "too upset." (Tr. 61, PAGEID #: 123).

## C.    Opinion Evidence

### 1.    Examining Consultant

Jack J. Kramer, Ph.D. conducted a psychological evaluation of B.T.B. on January 20, 2014, to assist in determining his eligibility for disability benefits. (Tr. 326, PAGEID #: 388). At the time, B.T.B. had no prior mental health diagnosis and was not on medication or undergoing counseling. (*Id.*). Additionally, although B.T.B. was five years old and had an Individualized Education Program ("IEP"), he was not enrolled in public school or preschool at the time of his visit. (Tr. 327, PAGEID #: 389). Consequently, "[n]o records were available for review." (Tr. 326–27, PAGEID #: 388–89) (noting that B.T.B.'s grandmother did not provide any medical records, school records, or records concerning B.T.B.'s IEP or qualification for special education services).

Dr. Kramer provided the following functional assessment:

**Describe the claimant's abilities and limitations in acquiring and using information relative to the functioning of typically-developing children of the same age:**
Cognitive skills are estimated to be within a borderline to low average range; however no prior test scores were available. His ability to understand and process information is developing but seems slightly behind expectations (e.g., he does not know all his upper case letters) for his age. He has not been involved in any formal school setting at this point, although his grandmother indicated that [B.T.B.] has been identified for special education services. Memory skills appear adequate and he was able to name a couple of friends at school. His ability to understand information and be responsive to requests all suggested cognitive skills that are a little behind expectations for his age.

**Describe the claimant's abilities and limitations in interacting and relating with others relative to the functioning of typically-developing children of the same age:**
[B.T.B.] appears capable of appropriate social interaction with adults and peers and demonstrated appropriate social skills during the current evaluation. On the other hand, the grandmother reports that he is quick to get upset at home and school. She suggests that he can be quick to get upset and difficult to calm down; he can be disruptive and occasionally aggressive when upset. He has friends at school and sometimes plays with children in his neighborhood, although the

grandmother suggests that neighborhood interactions can often end up in conflict. During the current examination, he demonstrated the ability to be pleasant, cooperative, and pleasant [sic] throughout the interview.

**Describe the claimant's abilities and limitations in self-care relative to the functioning of typically-developing children of the same age:**
[B.T.B.] engages in a range of home activities such as watching television, playing with his toys, and playing games. He can wash himself and bathe with a minimum of assistance. His grandmother expects him to clean up after himself when he plays, but he often needs reminders (he cleaned up here at the end of the examination when asked to do so). [B.T.B.] can pick out his clothes and dress himself in the morning, but his grandmother needs to monitor and check him over. He does not get a bowl of cereal or snack at home without assistance. As indicated throughout this report, there is a history of [B.T.B.] being sexually abused according to the grandmother. She reported previous problems with 'sexual boundaries' and an incident of inappropriate touching of a little girl at daycare.

**Describe the claimant's abilities and limitations in attending to and completing tasks relative to the functioning of typically-developing children of the same age:**
[B.T.B.] struggles a little with both poor concentration and heightened activity levels, at both home and school, according to his grandmother. However, during the current examination he sat quietly during the interview and played with a truck and toys without any problem. He was able to answer questions and return to playing. He helped clean up at the end of the examination. He likes to watch television and play with action figures. When there are problems with attention and task completion, problems seem more related to oppositional behavior than to an inability to be attentive or complete work.

(Tr. 328–29, PAGEID #: 390–91). In summarizing his findings, Dr. Kramer again noted that there were "no records available for review" but found B.T.B.'s "current problems" to be "consistent with a diagnosis of Oppositional Defiant Disorder." (Tr. 329, PAGEID #: 391).

## 2.    *Non-Examining Consultants*

Non-examining state agency medical consultant Leslie Rudy, Ph.D. rendered an opinion at the initial level on February 3, 2014, finding B.T.B. not disabled. (Tr. 89–93, PAGEID #: 151–55). Dr. Rudy gave great weight to Dr. Kramer's January 20, 2014 opinion, and found that B.T.B. had marked limitations in caring for himself (Tr. 90, PAGEID #: 152); less than marked

limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others (Tr. 89–90, PAGEID #: 151–52), and no limitations in moving about and manipulating objects and health and well-being. (Tr. 90, PAGEID #: 152).

Non-examining state agency medical consultant Katherine Fernandez, Psy.D. rendered an opinion at the reconsideration level on April 22, 2014, also finding B.T.B. not disabled. (Tr. 95–104, PAGEID #: 157–66). Like Dr. Rudy, Dr. Fernandez gave great weight to Dr. Kramer's January 20, 2014 opinion; however, Dr. Fernandez found that B.T.B. had less than marked limitations in caring for himself, acquiring and using information, attending and completing tasks, and interacting and relating with others (Tr. 100–01, PAGEID #: 162–63), and no limitations in moving about and manipulating objects and health and well-being. (*Id.*).

### D. Relevant Records

As set forth below, Plaintiff argues, *inter alia*, that the ALJ failed to develop the record adequately concerning B.T.B.'s limitations and relied on outdated opinion evidence in reaching his decision. Consequently, this Report and Recommendation focuses on the records created after Dr. Kramer's January 20, 2014 psychological evaluation but before the ALJ's April 27, 2016 decision.

#### 1. *Medical Records*

B.T.B. began treatment at Nationwide Children's Hospital on June 6, 2014, based on a referral for "behavioral problems" and "sexual behavior." (Tr. 523, PAGEID #: 585). Julia Garnica, P.C. found that B.T.B. suffered from anxiety symptoms, depressive symptoms, post-traumatic symptoms, inattention symptoms, hyperactivity/impulsivity symptoms, oppositional defiant symptoms, conduct problems, anger outbursts, and self-injurious behaviors. (Tr. 524–25, PAGEID #: 586–87). Ms. Garnica found B.T.B. to be severely emotionally disturbed, and

diagnosed him with sexual abuse of a child and disruptive behavior disorder. (Tr. 529, PAGEID #: 591).

In a "narrative/clinical impression" from the same month, Ms. Garnica stated:

Client is a 5 y/o male who currently lives with his maternal grandparents and two older siblings. Client has been linked to home based therapy to address management of disruptive, defiant, and sexual behaviors. Client has a long Hx of trauma—when he was 2.5 y/o, custody of client and siblings were … taken away from bio mom due to charges of neglect and poor living conditions. It is unclear as to conditions client was living in but known that mom was abusing substances at the time. Custody was given to [Plaintiff] with intentions of it returning to mom, however, mom has continued substance abuse. Client continues to see bio mom on a weekly basis, unsupervised visits. Client suffered from sexual abuse when he was age 3.5—he and same-age cousin were raped by mom's boyfriend's brother (age 14) when mom was living next door to maternal grandparents.

Client presents with symptoms of inappropriate sexual behavior and talk as well as poor boundaries. Clinician believes behaviors are symptoms which stem from sexual abuse client suffered and reinforced when around same-age cousin (who he sees on a weekly basis) who endured abuse as well. This child has also not received Tx for trauma and both have engaged in sexual behaviors with each other since the incident. Client indicates some symptoms of trauma including irritability, repetitive engagement in sexual behaviors, and difficulty sleeping. Client will be given a Dx of V code for sexual abuse, as symptoms do not indicate trauma diagnosis at this time; it is suggested the symptoms continue to be monitored.

Client also presents with externalizing symptoms of defiance, aggression, disruptive behavior, hyperactivity/impulsivity. Client seems to quickly lose control of anger in environments outside of home. He will become aggressive and destructive—triggers include not getting his way, low frustration tolerance, and rejection. Clinician believes severity of symptoms when outside the home may be related to feelings of anxiety. Since symptoms are also present in the home environment, although at a less severe level, client will be given a diagnosis of Disruptive Behavior NOS.

(Tr. 419, PAGEID #: 481). The goals for B.T.B. included creating healthy boundaries and decreasing hypersexual behaviors (Tr. 408, PAGEID #: 470), and at times during treatment he was noted to be agitated, irritated, restless, and having a labile affect (*see, e.g.*, *id.*; Tr. 400, PAGEID #: 462; Tr. 389, PAGEID #: 451). B.T.B. underwent a number of therapy sessions

through August 2014 (*see, e.g.*, Tr. 396, PAGEID #: 456 (July 7, 2014); Tr. 391, PAGEID #: 453 (July 21, 2014); Tr. 391, PAGEID #: 453 (July 28, 2014); Tr. 514, PAGEID #: 576 (August 4, 2014); Tr. 510, PAGEID #: 572 (August 11, 2014), Tr. 505, PAGEID #: 567 (August 18, 2014)) but the treating relationship was ultimately terminated because of poor attendance (*see* Tr. 455–56, PAGEID #: 517–18).

Jennifer Rimmke, M.D. treated B.T.B. at Nationwide Children's Hospital again on February 16, 2015, describing B.T.B. as a "6 year old male with [history of] sexual child abuse, exhibiting significant behavioral concerns (outbursts), signs of [Post-Traumatic Stress Disorder ("PTSD")], defiance, and exhibiting some sexual behaviors." (Tr. 460, PAGEID #: 522). Because transportation was noted to be an issue, Dr. Rimmke referred B.T.B. to Kristina R. Jiner, M.D., who was a closer drive for the family. (*Id.*).

Katie Novak, LISW-S, ACSW also saw B.T.B. the same day, and noted that Franklin County Children's Services had three prior involvements with the family, arising when B.T.B. was removed from his mother, when B.T.B. suffered sexual abuse, and when records were requested. (Tr. 457, PAGEID #: 519). Ms. Novak called Franklin County Children's Services to report Plaintiff's noncompliance with necessary sexual abuse treatment and educational neglect. (Tr. 454, PAGEID #: 516).

Dr. Jiner conducted a psychiatric examination of B.T.B. on April 22, 2015, describing him as "a 6 [year old] male with a history of ADHD, oppositional defiant disorder ("ODD"), trauma (sexual abuse and neglect), and problem sexual behaviors." (Tr. 430, PAGEID #: 492). Dr. Jiner noted that B.T.B.'s prior failure to attend treatment was because Plaintiff's "sciatica worsened and she was 'in bed for 7 weeks.'" (*Id.*). B.T.B. demonstrated anxiety symptoms, depressive symptoms, post-traumatic symptoms, inattention symptoms, hyperactivity/impulsivity

symptoms, oppositional defiant symptoms, conduct problems, anger outbursts, and self-injurious behavior, among other issues. (Tr. 431–33, PAGEID #: 493–95). Dr. Jiner found B.T.B. to have a demanding demeanor and noted that he avoided eye contact. (Tr. 436, PAGEID #: 498). Although she found B.T.B. cooperative, he was also restless and hyperactive, showing impaired attention/concentration, poor insight, and poor judgment. (*Id.*).

Upon review of B.T.B.'s chart and after examination, Dr. Jiner diagnosed B.T.B. with (1) ADHD-combined type; (2) anxiety disorder not otherwise specified (noting the need to rule out PTSD and generalized anxiety disorder); and (3) ODD. (*Id.*). Dr. Jiner advised B.T.B. should continue melatonin for sleep, and she prescribed Zoloft for anxiety/mood and Metadate CD for ADHD. (Tr. 437, PAGEID #: 499). As for B.T.B.'s ODD, Dr. Jiner stated that his:

> [s]ymptoms are likely largely related to the anxiety that [B.T.B.] experiences in addition to the ADHD symptoms. Would expect these symptoms [to] improve with treatment of his anxiety and ADHD. Grandmother would benefit from assistance with behavioral management. As [B.T.B.] is presently participating in NYAP's program will not refer for additional therapy. Will discuss possible referral moving forward.

(*Id.*).

Dr. Jiner saw B.T.B. again in May 2015. (Tr. 426, PAGEID #: 488). Although Plaintiff reported some improvement with medication, B.T.B. remained inattentive in school and had several physical altercations with his peers. (*Id.*). B.T.B. was continuing with therapy, where he was "working on boundaries." (*Id.*). Dr. Jiner found B.T.B. restless, hyperactive, impulsive, and noted that he had diminished eye contact. (Tr. 427, PAGEID #: 489). She also noted that B.T.B. had impaired attention, a fund of knowledge below the expected level, poor insight, and fair judgment. (Tr. 427–28, PAGEID #: 489–90). Dr. Jiner observed that B.T.B.'s behavior showed that the Metadate CD wore off by early afternoon, so Dr. Jiner also prescribed him Ritalin. (Tr. 428, PAGEID #: 490). Dr. Jiner's overall psychiatry plan was "medication management with the

goal of improved symptomology."  (*Id.*).

Dr. Jiner saw B.T.B. again in July 2015, noting improvement and finding that he was "doing well" for "[p]arts of the day" at school.  (Tr. 421, PAGEID #: 483).  Upon psychiatric exam with mental status evaluation, Dr. Jiner found B.T.B. restless, impulsive, noted that he had diminished eye contact, abnormal social reciprocity, blunted affect, a fund of knowledge below the expected level, poor insight, and fair judgment.  (Tr. 422–23, PAGEID #: 484–85).  Dr. Jiner commented that B.T.B. "[p]erseverated on his finger which had been bleeding because [he] was picking at it" and he blinked frequently.  (Tr. 423, PAGEID #: 485).  Dr. Jiner continued B.T.B.'s melatonin but advised that he "likely needs to receive the Ritalin at the school."  (*Id.*).  Consequently, Dr. Jiner recommended talking with B.T.B.'s "teachers about when they feel the Metadate CD wears off…."  (*Id.*).

Dr. Jiner examined B.T.B. in October 2015 and found continued improvement, with some opposition and defiant behavior remaining at home.  (Tr. 547–48, PAGEID #: 551–52).  Dr. Jiner found B.T.B. restless, impulsive, noted that he had diminished eye contact, abnormal social reciprocity, constricted affect, a fund of knowledge below the expected level, fair insight, but good judgment.  (Tr. 548–49, PAGEID #: 552–53).

In November 2015, B.T.B. received a confirmation that he had completed the National Youth Advocate Program—Healthy Ways Program.  (Tr. 593, PAGEID #: 655).  B.T.B. continued treatment with Dr. Jiner.  At a follow-up visit in January 2016, Dr. Jiner noted that, despite B.T.B. performing well academically, the "[s]chool [had] request[ed] that Ritalin be given in the late morning."  (Tr. 543, PAGEID #: 547).  Dr. Jiner stated that B.T.B. was not listening and following directions at home, he was irritated easily, oppositional and defiant, and aggressive with his siblings at times.  (*Id.*).  Dr. Jiner found B.T.B. restless, impulsive, noted that

he had diminished eye contact, abnormal social reciprocity, spoke with loud volume, impaired attention, a fund of knowledge below the expected level, poor insight, and poor judgment. (Tr. 544–45, PAGEID #: 606–07). Dr. Jiner switched B.T.B.'s ADHD medication to Concerta. (Tr. 545–46, PAGEID #: 607–08).

### 2. *Education Records*

In April 2014, a kindergarten readiness assessment report stated that "other children don't like to play with B.T.B. because he does not like to share and he sometimes hits or touches them for no reason." (Tr. 346, PAGEID #: 408). It likewise noted that B.T.B.'s oppositional behavior had "increased in the past several months despite interventions." (Tr. 347, PAGEID #: 409). For example, a teacher's note in B.T.B.'s IEP progress report stated:

> B.T.B. has a very difficult time keeping his hands and feet to himself. He impulsively touches other children just to bother them. He lies and says he didn't do it even if the teacher sees him. He has begun hitting staff members when he doesn't get his way and has had to be put in CPI hold and taken to the principal's office.

(Tr. 251, PAGEID #: 313).

A re-evaluation in August 2014 noted that B.T.B. was suspected to suffer from "the disability of Emotional Disturbance." (Tr. 350, PAGEID #: 412). Classroom observation reflected that B.T.B. was "fidgety, repositioning his body frequently," talking to a classmate, and "play[ing] with crumbs on the floor." (*Id.*). He was observed to be "picking at the Band Aids on his leg, tracing numbers on the carpet, and talking to himself." (*Id.*). B.T.B. "needed frequent reminders to stay quiet…." (*Id.*). B.T.B.'s behavior "negatively impact[ed] his academics," and he was determined to be "verbally and physically aggressive toward adults and peers; d[id] not want to share with peers; disrupt[ed] the work of others; [and] invade[d] the space of others and touche[d] people often." (Tr. 353, PAGEID #: 415). B.T.B. was "[e]asily upset over seemingly

14

minor incidents; disruptive; [had] difficulty with transitions; [threw] chairs/items when angry; [was] oppositional; exhibit[ed] sexualized behavior and require[d] supervision." (*Id.*). He was determined to be eligible for special education and related services in the category of emotional disturbance. (Tr. 354, PAGEID #: 416).

When B.T.B.'s IEP underwent review in March 2015, it was noted that his "behaviors require instruction in a behavior resource room;" however, he was "currently on home instruction due to unsafe behaviors in the school setting." (Tr. 365, PAGEID #: 427). The team stated that it "would like to see [B.T.B.] improve his behaviors and academic skills and return to a school setting." (*Id.*). Concerning B.T.B.'s present level of academic achievement and functional performance, the report provided:

> According to observations and assessments, [B.T.B.'s] behaviors impede his education greatly and has been on home instruction since early December of 2014. From his observations in the classroom, [B.T.B.] demonstrates aggressive behaviors, inappropriate behaviors with sharing and peer cooperation, and interpersonal problems. When behaviors escalate, [B.T.B.] will become aggressive towards peers, adults, personal and school property, and will often throw temper tantrums.

(Tr. 369, PAGEID #: 431).

The following month, a representative from Columbus City Schools held a meeting concerning B.T.B.'s school placement, during which all members present agreed with the district's proposal to discontinue home instruction and place B.T.B. at the Briar Patch Ranch for kids. (Tr. 244, PAGEID #: 306). The report explained that:

> [B.T.B.] was placed on home instruction due to behaviors he was displaying in the school setting. The team feels that [B.T.B.] needs to return to a more formal school setting, however he continues to require intensive behavior supports beyond that of his home school. The team agrees that Briar Patch would be a more appropriate setting for [B.T.B.] at this time.

(*Id.*).

Teacher reports from Briar Patch Ranch provided repeatedly that B.T.B. "continue[d] to challenge." (Tr. 246, PAGEID #: 308). B.T.B. "test[ed]" the teachers and had "to sit in time-out for hitting a boy, touching someone's hair and refusing to get off the computer." (Tr. 247, PAGEID #: 309; *see also* Tr. 249, PAGEID #: 311 (noting that B.T.B. "is very defiant at times")). A different note provided that, when a teacher put her hair up because it was warm in the room, B.T.B. "put his hand on [her] front waist and said, 'I like your hair like that.'" (Tr. 250, PAGEID #: 312).

B.T.B.'s November 2015 report card from Briar Patch Ranch indicated all As and one B, and stated that he "usually behaves well for the first part of classes but he has difficulty focusing during the last hour or so." (Tr. 552, PAGEID #: 614). However, by the end of February beginning of March 2016, the morning color describing B.T.B.'s behavior was repeatedly "red," he "would not participate," and "went off at least 3 times" during one day, "flip[ing] chairs and would not listen." (Tr. 253, PAGEID #: 315). He was also noted to be "very disrespectful," "toss[ing] his chips across the room" and "complain[ed] about not having a sandwich." (*Id.*). B.T.B. received two "red[s]" and one "green" describing his behavior in the afternoons, and it was reported that he "refused to work" and "had to be removed from class." (*Id.*). B.T.B. also "[h]ad a lot of trouble keeping [his] hands and body still," he was "pounding" and "hit a student." (*Id*).

### 3. Relevant Portions Of The ALJ's Decision

Noting B.T.B.'s birth date of September 18, 2008, the ALJ found he was a preschooler on the date the application was filed (October 2, 2013), and a school-aged child on the date of the decision (April 27, 2016). (Tr. 30, PAGEID #: 92) (citing 20 C.F.R. 416.926a(g)(2)). The ALJ determined that B.T.B. suffered from the severe impairments of ODD, disruptive behavior not

otherwise specified, ADD, and mood disorder with anxiety. (*Id*.). However, the ALJ stated that B.T.B. did not suffer from an impairment or combination of impairments that met or functionally equaled the severity of the listings. (*Id*.). The ALJ found that, although B.T.B.'s medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, the statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the record evidence. (Tr. 32, PAGEID #: 94).

The ALJ noted, *inter alia*, that B.T.B. was diagnosed with ODD only at the January 20, 2014 evaluation, and he was not on medication or undergoing counseling at the time. (*Id*.). The ALJ stated that the examining psychologist's functional assessment showed "less than marked limitations in acquiring and using information, attending and completing tasks, caring for himself, and interacting and relating to others." (Tr. 33, PAGEID #: 95). The ALJ gave the opinion only partial weight because it was based on a one-time evaluation, relied heavily on Plaintiff's representations, and underlying records were unavailable. (Tr. 33, PAGEID #: 95). Further, the ALJ gave "some weight" to the opinion evidence at the initial and reconsideration levels. (Tr. 36, PAGEID #: 98).

Upon review of the evidence, the ALJ determined that B.T.B. had a marked limitation in interacting and relating with others; a less than marked limitation in acquiring and using information, attending and completing tasks, caring for himself; and no limitation in moving about and manipulating objects and health and physical well-being. (Tr. 37–45, PAGEID #: 99–107). The ALJ clarified that, although the evidence supported a marked limitation in social functioning, it was not extreme because B.T.B. "is still in early treatment for his mental impairments, with improvement in symptoms noted one exam and by report." (Tr. 35, PAGEID

#: 97). The ALJ further noted that B.T.B.'s "[m]edications were still being adjusted to better control his behavioral symptoms." (*Id.*).

Because the ALJ determined Plaintiff failed to show that B.T.B. had an extreme limitation in one domain or a marked impairment in more than one domain, he found B.T.B. was not disabled as defined in the Social Security Act. (Tr. 37–45, PAGEID #: 99–07). Accordingly, the ALJ denied Plaintiff's application. (*Id.*).

## II. STANDARD OF REVIEW

This Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her first statement of error, Plaintiff challenges the legal sufficiency of the ALJ's decision based upon his reliance on outdated opinion evidence. (Doc. 12 at 18). More specifically, Plaintiff states that the ALJ improperly relied on consultative examiner Dr. Kramer

and state agency consultants Dr. Rudy and Dr. Fernandez, none of whom had the benefit of B.T.B.'s "much more extensive medical and educational records" when they provided in their opinions in early 2014. (*Id.*; Doc. 15 at 1). Thus, Plaintiff contends that the opinion sources were unable to "take into account [B.T.B.]'s persisting behaviors, even with medication." (Doc. 12 at 19). Plaintiff also states that the opinions fail to account for B.T.B.'s subsequent change in "categories to a school-aged child, which requires different milestones than that of a preschool child." (*Id.*) (citing 20 C.F.R. § 416.926a).

> In opposition, Defendant relies on a decision noting the difficulty with the process is
>
> that no record is "complete"—one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on. Taking "complete record" literally would be a formula for paralysis, undermining all of the objectives of simplified procedure.

(*See* Doc. 14 at 7) (citing *Kendrick v. Shalala*, 998 F.2d 455, 456–57 (7th Cir. 1993)). Defendant points to the ALJ's discretion in determining how much evidence is necessary, and faults Plaintiff's counsel for failing to "point out the absence of such records" or "request a consultative examination." (*Id.*). Finally, Defendant claims that the ALJ properly found that B.T.B.'s condition improved following the opinion evidence, so further development of the record was unnecessary. (*Id.* at 7–8).

The ALJ has a well-established duty to develop the record even if a plaintiff is represented by counsel. *See Johnson v. Sec'y of Health and Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986); *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983); *Chester v. Comm'r of Soc. Sec.*, No. 11-1535, 2013 WL 1122571, at *8 (E.D. Mich. Feb. 25, 2013). This duty arises because "[s]ocial security proceedings—unlike judicial ones—are inquisitorial, not adversarial." *Chester*, 2013 WL 1122571, at *8. Further, development of the

record has been said to be particularly important where impairments are mental. *See, e.g.*, *Gallo v. Colvin*, No. 15-cv-9302, 2016 WL 7744444, at *9 (S.D.N.Y. Dec. 23, 2016) (noting that the "ALJ's duty to develop the record is 'enhanced when the disability in question is a psychiatric impairment,' because the Commissioner must be 'sensitive to the dynamism of mental illnesses'"), adopted by 2017 WL 1215219 (Mar. 31, 2017).

Although there is "no bright line test" for determining whether the ALJ has failed to fully develop the record, *Lashley*, 708 F.2d at 1052, matters are subject to remand if an ALJ makes an equivalency determination "based on an outdated source opinion that did not include consideration of a critical body of objective medical evidence." *Parker v. Colvin*, No. 15-12558, 2016 WL 4775469, at *12 (E.D. Mich. Aug. 17, 2016), adopted by 2016 WL 4761785 (Sept. 13, 2016); *see also Smukala v. Comm'r of Soc. Sec.*, No. 15-10612, 2016 WL 943953, at *11–12 (E.D. Mich. Feb. 23, 2016), adopted by 2016 WL 931161 (Mar. 11, 2016) (remanding where the medical opinion was rendered prior to further development of the medical record); *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866, at *1–3 (N.D. Ohio Oct. 21, 2011) (remanding where "[t]he record contain[ed] a body of medical evidence from treating sources that no medical source reviewed or evaluated"). In other words, an ALJ may not rely on the opinions of consulting sources if the evidence post-dating their assessments shows a significant change in condition or if the subsequent records are inconsistent with the opinions. *See Cepeda o/b/o E.G. v. Colvin*, No. 16-042S, 2017 WL 1233823, at *7 (D.R.I. Jan. 6, 2017) (remanding based on a material change in circumstances following the opinions of consulting sources), adopted by 2017 WL 1034633 (Mar. 17, 2017).

In this case, after the opinions were rendered, B.T.B. began treatment for "behavioral problems" and "sexual behavior" in June 2014, was found to be severely emotionally disturbed,

and was diagnosed with sexual abuse of a child and disruptive behavior disorder. (Tr. 523, PAGEID #: 585; Tr. 529, PAGEID #: 591 (June 2014); *see also* Tr. 396, PAGEID #: 458, Tr. 391, PAGEID #: 453 (July 2014 therapy sessions); Tr. 514, PAGEID #: 576, Tr. 510, PAGEID #: 572, Tr. 505, PAGEID #: 567 (August 2014 therapy sessions)). After a gap in treatment, in April 2015, B.T.B. began seeing Dr. Jiner, who diagnosed him with ADHD-combined type, anxiety disorder not otherwise specified, and ODD. (Tr. 436, PAGEID #: 498). Dr. Jiner also prescribed B.T.B. Zoloft for anxiety/mood and Metadate CD for ADHD and advised him to continue melatonin for sleep. (Tr. 437, PAGEID #: 499).

Although B.T.B. showed some improvement with medication, Dr. Jiner's notes demonstrate that his symptoms persisted. (*See, e.g.*, Tr. 427–28, PAGEID #: 489–90 (observing that B.T.B. was restless, hyperactive, impulsive, had diminished eye contact, impaired attention, a fund of knowledge below the expected level, poor insight, and fair judgment in May 2015); Tr. 421–23, PAGEID #: 483–85 (finding B.T.B. was restless, impulsive, perseverated on his finger, had diminished eye contact, abnormal social reciprocity, blunted affect, a fund of knowledge below the expected level, poor insight, and fair judgment in July 2015); Tr. 548–49, PAGEID #: 552–53 (noting that B.T.B. restless, impulsive, noted that he had diminished eye contact, abnormal social reciprocity, constricted affect, a fund of knowledge below the expected level in October 2015); Tr. 544–45, PAGEID #: 606–07 (finding B.T.B. was restless, impulsive, had diminished eye contact, abnormal social reciprocity, spoke with loud volume, impaired attention, possessed a fund of knowledge below the expected level, and had poor insight and judgment in January 2016)).

B.T.B.'s behavioral problems also continued (*see, e.g.*, Tr. 426, PAGEID #: 488 (noting inattentiveness in school and "several physical altercations" with his peers in May 2015); Tr.

421, PAGEID #: 483 (finding B.T.B. doing well for only "[p]arts of the day" at school in July 2015); Tr. 547–48, PAGEID #: 551–52 (observing that B.T.B. continued to demonstrate opposition and defiant at home in October 2015); Tr. 543, PAGEID #: 547  (stating that B.T.B. was not listening and following directions at home, he was irritated easily, oppositional and defiant, and aggressive with his siblings at times in January 2016), and his medication needed adjustment and evaluation (Tr. 428, PAGEID #: 490 (adding Ritalin in May 2015); Tr. 423–25, PAGEID #: 485–87 (noting B.T.B. "likely needs to receive the Ritalin at the school" and recommending talking with B.T.B.'s "teachers about when they feel the Metadate CD wears off" in July 2015); Tr. 543, PAGEID #: 605 (stating that B.T.B.'s "[s]chool [had] request[ed] that Ritalin be given in the late morning" in January 2016); Tr. 545–46, PAGEID #: 607–08 (switching B.T.B.'s ADHD medication to Concerta in January 2016)).

Finally, B.T.B. was enrolled in school following Dr. Kramer's evaluation, and his education records reflect problematic behavior.  (*See, e.g.*, Tr. 346, PAGEID #: 408 (stating that "other children don't like to play with B.T.B. because he does not like to share and he sometimes hits or touches them for no reason" in April 2014); Tr. 350, PAGEID #: 412 and Tr. 353–54, PAGEID #: 415–16 (noting B.T.B.'s eligibility for special education and related services due to emotional disturbance, citing numerous problematic behaviors including throwing chairs in April 2014); Tr. 365, PAGEID #: 427 and Tr. 369, PAGEID #: 431 (noting that B.T.B.'s aggressive and inappropriate behaviors and interpersonal problems impede his education in March 2015); Tr. 244, PAGEID #: 306 (finding B.T.B. requires intensive behavior supports and recommending Briar Patch Ranch in May 2015).  Even after his arrival at Briar Patch Ranch, B.T.B. continued to have difficulty.  (*See, e.g.*, Tr. 246–47, PAGEID #: 308–09 (stating that B.T.B. "continue[d] to challenge" the teachers and was aggressive); Tr. 250, PAGEID #: 312 (stating that, when a

teacher put her hair up because it was warm in the room, B.T.B. "put his hand on [her] front waist and said, 'I like your hair like that'"); Tr. 552, PAGEID #: 614 (noting difficulty focusing); Tr. 253, PAGEID #: 315 (observing B.T.B.'s behavior was red and included flipping chairs, throwing chips, and hitting a student)).

Although the ALJ had access to the information regarding B.T.B.'s treatment, diagnosis, medication, and education, the doctors on whose opinions he relied did not. This is because Dr. Kramer (who was given great weight by Dr. Rudy and Dr. Fernandez when they rendered their opinions on February 2014 and April 2014, respectively) conducted his psychological evaluation of B.T.B. in January 2014, before B.T.B. had any mental health diagnosis, when he was not on medication or undergoing counseling, and when he was not enrolled in public school or preschool. (Tr. 326–27, PAGEID #: 388–89). Consequently, no records were available for Dr. Kramer to review—a fact he mentioned repeatedly throughout his opinion. (Tr. 326, PAGEID #: 388 ("No [mental health] records were available for review."); Tr. 327, PAGEID #: 389 ("No school records and no documentation of special education services were provided…."); *id.* ("He has been qualified for special education services, although no records were available for review."); Tr. 328, PAGEID #: 390 (noting "no prior test scores were available"); Tr. 329, PAGEID #: 391 ("He has been identified for special education services according to the grandmother, although no records were available for review and he has not been involved in any preschool program."); *id.* ("There is no indication of a prior mental health diagnosis, although current problems seem consistent with a diagnosis of Oppositional Defiant Disorder.")).

Dr. Kramer's repeated references to the lack of underlying records demonstrate that they would have been relevant to his assessment. *See Cepeda o/b/o E.G.*, 2017 WL 1233823, at *7. Indeed, having records from the school, doctors, and counselors provide a greater insight into

B.T.B.'s medical diagnoses, behaviors, and limitations. It also would have been relevant, as Plaintiff argues, that following B.T.B.'s examination he changed from a preschooler to a school-aged child. *See* 20 C.F.R. § 416.926a(g)(2)(iii)–(iv); *see e.g.*, *Gallo*, 2016 WL 7744444, at *7 ("In domains (1) through (5), the Social Security regulations describe the performance expected of a child without impairments by age group, with one set of skills expected of preschoolers (defined as children from age 3 to the attainment of age 6) and a more advanced set of skills expected of school-age children (defined as children from age 6 to the attainment of age 12)."); *see also Herring ex rel. v. Comm'r of Soc. Sec.*, No. 1:14cv181, 2015 WL 1478010, at *5–7 (W.D. Mich. Mar. 31, 2015) (noting the difference milestones expected of preschoolers and school-aged children).

The opinions of those "who did not review the entire record are not automatically invalidated where the ALJ considered them in conjunction with the omitted evidence." *McMichael obo M.M. v. Comm'r of Soc. Sec.*, No. 1:15-cv-1135, 2016 WL 3247877, at *10 (N.D. Ohio May 20, 2016) (nevertheless remanding because the ALJ did not properly evaluate the evidence, and his reliance on the opinions of the state agency psychological consultants, who did not review the entire record, was in error), adopted by 2016 WL 3230660 (June 13, 2016). However, because the particular circumstances of this case reflect that the opinions upon which the ALJ relied were based on a significantly incomplete record rendered before B.T.B.'s change from a preschooler to a school-aged child, the Court finds the opinion unsupported by substantial evidence. *See, e.g.*, *Farah on behalf of M.A. v. Comm'r of Soc. Sec.*, No. 1:16-cv-624, 2017 WL 3531517, at *7 (S.D. Ohio June 12, 2017), adopted by 2017 WL 3520183 (Aug. 16, 2017) (remanding where ALJ relied on outdated state agency physician); *Roberts on behalf of J.W. v. Colvin*, No. 14-13194, 2015 WL 5432388, at *4 (E.D. Mich. July 23, 2015), adopted by 2015

24

WL 5336654 (Sept. 14, 2015) (noting that the ALJ is required to "seek an updated opinion on medical equivalence where medical evidence is received that may change a consultant's finding that an impairment is not equivalent to a listing" and remanding where the minor's longitudinal medical record describes symptoms more severe than the ALJ identified); *Herring*, 2015 WL 1478010, at *8 (remanding where the minor's "performance and advancement were not nearly as significant as the ALJ suggest[ed]"); *Alcantara v. Astrue*, 257 F. App'x 333, 334 (1st Cir. Dec. 12, 2007) (per curiam) ("Absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own judgment for medical opinion."); *A.D. ex rel. Davis v. Comm'r of Soc. Sec.*, No. 11-cv-12966, 2014 WL 4473779, at *10 (E.D. Mich. Sept. 9, 2014) (remanding based on the ALJ's failure to adequately develop the record).

The ALJ indeed acknowledged B.T.B. "is still in early treatment for his mental impairments" (Tr. 35, PAGEID #: 97) and repeatedly noted that his "medications were still being adjusted to reduce [his] symptoms" (*id.*; *see also id.* (again noting that B.T.B.'s "[m]edications were still being adjusted to better control his behavioral symptoms"); Tr. 39, PAGEID #: 101 (observing that B.T.B.'s "[m]edications were to be adjusted due to school reports"); Tr. 41, PAGEID #: 103 (noting that B.T.B.'s "medications are still being adjusted for improvement"); Tr. 49, PAGEID #: 103 (same)). Taking all of the foregoing into consideration, the Court recommends remand for further consideration.

The Court's recommendation to reverse and remand on Plaintiff's first statement of error eliminates the need for analysis of Plaintiff's remaining assignments of error. Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

## IV.     CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## V.     PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:  February 21, 2018                         /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE